Filed 8/25/23  P. v. Watson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DALE WILLIAM WATSON,<br><br>    Defendant and Appellant. | F083283<br><br>(Super. Ct. No. PCF377332)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## STATEMENT OF THE CASE

On March 7, 2019, a felony complaint was filed charging Dale William Watson with murder (Pen. Code,[1] § 187, subd. (a)); with various firearm allegations (§ 12022.53, subds. (b), (c), (d)); an allegation that he was on felony probation at the time (§ 1203, subd. (k)); and that he had two prior felonies within the three strikes law (§ 1203, subd. (e)(4)). Watson pled not guilty to the murder charge and all allegations.

Before trial, on September 6, 2019, counsel for Watson declared a doubt as to his competence and criminal proceedings were suspended. (§ 1368.) A competency trial, with jury, was held January 2–3, 2020, finding Watson competent to stand trial. Criminal proceedings were reinstated.

On July 2, 2020, Watson was charged by information, in count 1, with the first degree murder of D.A. with personal use of a firearm while being on felony probation (§§ 187, subd. (a), 12022.53, subds. (b)–(d), 1203, subds. (e)(4) & (k)); in count 2, with felon in possession of a firearm (§ 29800, subd. (a)(1)); and in count 3, with possession of ammunition while being prohibited from owning a firearm (§ 30305, subd. (a)(1)). All offenses were alleged to have occurred on March 3, 2019. Watson entered a not guilty plea and denied the special allegations.

On April 2, 2021, a jury found Watson guilty of counts 2 and 3. The jury also found Watson not guilty of count 1, first degree murder, but guilty of the lesser offense of second degree murder with true findings on personal use of a firearm.

On June 11, 2021, Watson requested time to bring a motion for a new trial based on ineffective assistance of counsel. The trial court appointed conflicts counsel to conduct the proceedings. The motion was denied August 12, 2021.

On August 31, 2021, with conflicts counsel remaining as counsel of record, the trial court found the allegation that Watson was on felony probation to be true.

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

Thereafter, the court denied probation and sentenced Watson to a total prison term of 40 years to life as follows: 15 years to life for count 1, plus a consecutive 25 years to life for the gun allegation for count 1; a concurrent three-year upper term for count 2; and an upper term sentence of three years for count 3, stayed pursuant to section 654. Watson was given 1,046 total days custody credits and ordered to pay $10,000 in parole restitution, victim restitution of $7,500, with $210 for remaining fines and fees.

## STATEMENT OF THE FACTS

In March of 2019, Jacqueline R. was living and working at Hales Cottage Motel in downtown Tulare on K Street. The motel was known to police for drug sales and prostitution.

Jacqueline R.'s "son's cousin," D.A., visited Hales Cottage occasionally, and she was there on the night of March 2, 2019, helping Jacqueline R. paint a room Jacqueline was moving into. D.A. left and went to another motel room, where Joshua L. lived. Joshua L. had known D.A. since she was a baby. D.A. spent the night in Joshua L.'s room, sleeping on a chair.

Joshua L. recalled D.A. "acting out" and being "irate" the next morning, March 3. Jacqueline R. and Joshua L. tried to calm D.A. down, but she was telling people to leave her alone. When D.A. did calm down, Joshua L. returned to his room, and D.A. stayed with Jacqueline R.

Later that morning, Jacqueline R. noticed a truck pull into the motel area, leave, and then return. The driver, whom Jacqueline R. identified as Watson, asked her if she was a prostitute. Jacqueline R., who had never seen Watson before, asked him why he was there. Watson said he was looking for a "girl" or "friend." When Jacqueline R. asked for her name, Watson would not say.

The motel manager came out and spoke to Jacqueline R., Watson, and D.A., who was also there. D.A. jumped into Watson's truck, although Jacqueline R. told Watson not to let her do so. D.A. and Watson drove away. Jacqueline R. testified that D.A. was

3.

not being violent at the time, and denied telling Detective Van Curen that D.A. was acting like she was high on methamphetamine.

At around 8:00 or 8:30 a.m. on March 3, Christopher G. was driving northbound on Freeway 99 when his truck broke down, near Elk Bayou Park. As he was working on his truck at the side of the road, he heard a pickup drive by, but paid no attention to it. About five or six minutes later, he heard a gunshot or two—he thought the second sound might have been the recoil. Christopher G. then saw a truck, brown in the front and yellow in the back with a brown toolbox, later identified as Watson's truck, leave the area after the shooting.

Watson's girlfriend, April O., had known Watson for 35 years and dated him for 11 years. In March 2019, April O. was living with her father, but regularly stayed at Watson's mobile home off Highway 190 in Poplar, south of Tulare. Watson drove a dark brown and beige GMC pickup truck. On the night of Friday, March 1, April O. spent the night with Watson and he dropped her off at her father's house around noon the following day, and she did not see him again until Sunday (March 3) in the late afternoon, early evening. Watson had called April O. at around 11:00 a.m. that day and said he was going to get a weed eater to clean up the property where he lived.

April O. saw Watson again on Monday, March 4, at work when she took him to lunch. Watson's mustache had been shaved off, but April O. claimed he did that periodically. Watson made no mention of getting into a fight.

When April O. saw Watson on Tuesday, March 5, his truck had been painted with primer. April O. had seen Watson with a pistol in 2017, and she had previously seen him at a hotel in Tulare without her at the beginning of their relationship. April O. did not recall telling a police officer that she found an "adult finder" on Watson's phone. April O. acknowledged that Watson used methamphetamine off and on during their relationship. She was not certain, but thought that, in March of 2019, he was using every day. When Watson came down from the drug, he would act like a child and throw a

4.

tantrum, be mad, and slammed things around. She admitted Watson would sometimes get violent when he was coming down from methamphetamine, but she never saw him be violent towards anyone.

*Police Investigation*

At about 5:23 p.m. on March 3, 2019, Police Officer Jose Valencia was dispatched to the area of Elk Bayou Park located just off Highway 99, south of Hales Cottage Motel, regarding a possible gunshot victim. When he arrived, he saw a body on the ground, and he made contact with Eric F., who had been riding his dirt bike when he discovered the body and called police. Officer Valencia spoke to Eric F., who reported he found the victim with no one around. The victim, later identified as D.A., had suffered a gunshot wound to the torso and was found lying on a dirt access road.

Officer Cynthia Vasquez arrived shortly thereafter and searched the scene. No shell casings were found and there were no percipient witnesses present. A notepad, methamphetamine pipe, a lighter, a lottery ticket, and the blade of a utility knife were found two to three inches from D.A. D.A. had bruising and marks on her neck and left hand and injury to her fingers. Fresh tennis shoe and oversized tire tracks were found in the mud area near the body.

Chief Deputy Coroner Alan Knight examined D.A.'s body at the scene and found no signs of strangulation. Knight opined D.A. had died within eight to 12 hours prior to his inspection.

Dr. Garry Walter conducted an autopsy of D.A. and concluded she died of a single perforating gunshot wound to the chest with entry and exit wounds. She had a third wound on the left hand.

Dr. Othon Mena reviewed Dr. Walter's report, the toxicology report, multiple police reports, and photographs of the autopsy and death scene, and opined D.A.'s shooter had been a few inches to more than a few feet away when the gun was fired. He opined D.A. died within minutes of being shot, and the bone fracture on her left hand

could also have been the result of a gunshot wound. Dr. Mena opined the bullet to be in the .30- to .40-caliber range. He saw no signs of the bullet hitting something before it struck the body.

Retrieved surveillance videos showed Watson's truck at about 8:20 a.m. on March 3, going southbound just west of Highway 99, towards where D.A.'s body was found. Video footage from a mobile home that faced Elk Bayou Park showed Watson's truck driving slowly in the early morning hours. And a surveillance video from Hales Cottage at 8:14 a.m. on March 3, shows Jacqueline R., D.A., Watson, and the owner of the motel. D.A. is also seen talking to an unknown man who was staying at the motel and then getting into Watson's truck.

Police spoke with Fausto Hernandez, the owner of G&M Auto where Watson worked. While there, Sergeant Kenneth Jones found a can of primer and a new jacket that was later identified as belonging to Watson. Hernandez told Sergeant Jones that he helped Watson paint his brown or gold C10 truck to a flat green color, because Watson told him he got into "a little trouble with some guy" and wanted to paint it. Watson also borrowed a weed eater to clean up his yard. Watson rented trailer space in front of Hernandez's house in Poplar.

### *Watson's Post-Arrest Statements*

Watson was taken into custody on March 5, and interviewed twice by police. Both interviews were played for the jury.

During the first interview, Watson was read his *Miranda*[2] rights and stated that he had been using methamphetamine at a truck stop between Tulare and Tipton on Saturday evening (March 2, 2019), and decided to drive to Hales Cottage to buy more. While there, Watson ran into a big "black lady" who sold him some drugs and asked him to help her move some "stuff," when D.A. came up "raising hell." Watson helped the woman

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436, 478–479.

move her furniture, but D.A. was adamant about being given a ride to the store and jumped into his truck. The woman told D.A. to get out of the truck and leave, but she refused.

Watson stated he did not want any problems and decided to take D.A. to Love's Truck Stop and get rid of her. But when they got there, D.A., who had been smoking methamphetamine in the truck, refused to get out. D.A. said she needed to make some money and threatened to take Watson's truck while holding a razor blade.

When Watson saw a car pull up that he had seen earlier at the motel, he took off with D.A. still in the truck. Watson took D.A. to a park and tried to get her out of the truck. D.A. cut the truck's seat and seat belt while he physically removed her from the truck, stating he "feared for [his] life." After he removed D.A. from the truck, Watson took off. While backing up, he thought he ran over her because he was "driving as fast as [he] fucking [could]."

Watson denied having a gun or shooting D.A., and, if he had, "[I]t would have been self-defense," as she had a razor blade and was trying to hurt him. Watson described seeing D.A. fighting with the "big lady" at the motel, and kicking at the passenger door and slamming the driver's door of his truck. He also recounted that D.A. threatened to take his truck or have her "man" take it. Watson said "that girl was evil. There was lot of people probably wanted to kill that bitch."

Watson acknowledged being a felon, but reiterated that, even if he shot D.A. it would be self-defense because she tried to hurt him with a razor blade. Watson claimed to be surprised when he learned D.A. had died, and was adamant that, when he left her, she was yelling at him and he did not shoot her. Watson alleged that he primered his truck because it needed to be repainted.

Watson was interviewed a second time the following day. Watson related the same account of giving D.A. a ride and her then refusing to get out of his truck, and that she pulled a razor blade and threatened to take his truck. Watson said he left Love's with

7.

D.A. when he saw the same vehicle at Love's that he had seen at Hales Cottage and thought it was D.A.'s pimp or boyfriend trying to steal his truck. While they were driving, D.A. grabbed a fork from the dash and began damaging the dash of his car with the razor and the fork. He stopped on a dirt road next to the park and yelled at D.A. to get out.

D.A. refused to get out. Watson got out of the driver's side and tried to open the passenger door. But D.A. had locked the door, so Watson ran back to the driver's side, which was still open, to retrieve his keys. On his way, he grabbed a gun he had hidden under his toolbox. Again inside the truck, Watson held the gun and told D.A. to get out. D.A. lunged at him. Watson grabbed D.A.'s hand and reached over to the passenger door to open it and push her out. D.A. tried to hit or cut him as he did so. Although D.A. continued to resist and fight, Watson managed to push her out of the truck when she lunged at him again and the gun went off accidently. Watson thought the first shot hit the truck door because, after he pushed her out, D.A. was standing outside the passenger door laughing and cutting his seat belt with the razor blade.

D.A. yelled at Watson and threatened that he was "a dead motherfucker." Watson pulled the trigger the second time to scare her, as he saw "some fucking psycho bitch trying to kill me and take my truck." Watson had no idea D.A. had died until police told him; he did not think he had hit her. Watson admitted there was a couple of seconds between shots, but he did not point the gun at her, only towards her. Watson explained that, after the first shot, his truck would not start and when D.A. started coming after him, he thought she would kill him. Watson pulled the trigger the second time because D.A. was trying to kill him and he wanted to "scare the bitch."

Watson explained that he initially lied to police about the shooting because he was scared. He believed he acted in self-defense because D.A. was threatening him with a weapon. Watson denied painting his truck or shaving his mustache to hide from police. He did not think of calling police because he is a felon with a gun. Watson did not see

D.A. lying on the ground.  Watson sold his gun, but would not say who he sold it to, stating, "The gun's gone."

*Forensic Evidence*

When Watson was taken into custody, he had abrasions or scratch marks on the top of his left hand.  No expended casings or ammunition was found where D.A.'s body was discovered.  It was opined that the tires on Watson's truck had the same tire design and size as the tire impressions taken from the crime scene.

D.A.'s DNA was found on the razor blade discovered at the scene and tested presumptive positive for blood.  Watson's DNA was not found on the razor.  D.A.'s DNA was eliminated from the sperm and non-sperm factions from penile samples taken from Watson's sexual assault kit.  There was no semen found on the samples taken from D.A.'s assault exam.  Watson's DNA was found on a pair of jeans found in his truck, which tested presumptive positive for blood.

Three particles, one characteristic of gunshot residue (GSR) and two consistent with GSR were found on the back of Watson's jacket.  No GSR samples were taken from the inside of Watson's truck and no analysis of a GSR residue stub obtained from inside the truck was tested.

*Defense Case*

Kenton Wong, a senior forensic scientist at the Forensic Analytical Crime Lab in San Francisco, testified as an expert for the defense.  He reviewed Department of Justice reports regarding GSR in this case, but found nothing "remarkable."  Wong also reviewed the report that mentioned collection of GSR from Watson's jacket and found it was not consistent with what would typically be found when a gun is fired, which would show a "plume" of thousands of residue particles.  Instead, he found the particles more consistent with contamination from GSR.

Wong opined that the toxicology report for D.A. showed that, at the time of her death, the amount of methamphetamine in her system was "indicative of someone who

was intoxicated and under the influence." An individual with that level of the drug would experience "extreme anxiety, maybe paranoia, [and] confusion," and could act aggressively and violently.

Psychologist Doriann Hughes conducted an evaluation of Watson on September 20, 2019, and diagnosed him with bipolar disorder, which is characterized by cycling episodes of manic behavior and depressive symptoms. When she evaluated Watson, he was displaying symptoms of mania, meaning his mood was elevated and his thoughts racing, irrational, and paranoid. Dr. Hughes opined that people with bipolar disorder do not process information in time to react to a situation like a perceived threat, but instead their body is already preparing to respond to the threat before thinking it through. Dr. Hughes explained that, for someone who is bipolar, the stressful event is viewed through the lens of psychosis or paranoia so that decision making is short-circuited.

Mariana Hernandez testified that she worked at the Quick Trip in March of 2019, where D.A. was a frequent customer, often with Raul, who also went by Salvador or Chaba. The day before D.A. died, Hernandez overheard Raul threatening to kill her. Raul was under the influence and talking nonsense, a regular occurrence.

Maby Gomez also worked at the Quick Trip and knew D.A. and Raul, who was described as D.A.'s boyfriend, as frequent customers. On March 2, 2019, Gomez overheard Raul call D.A. a "fucking black woman" who did not know what he was capable of doing.

Defense investigator Wayne Autry spoke with witness Christopher G. about his car breaking down on the side of the road. Although Christopher G. had testified that his Ford F-150 broke down, he told Autry it was a semi-tractor truck. In addition, Christopher G. told Autry he heard only one gunshot.

10.

## DISCUSSION

### I. WAS THERE INSUFFICIENT EVIDENCE WATSON WAS COMPETENT TO STAND TRIAL?

Watson contends there is insufficient evidence to sustain the jury's determination of competency, thus the jury's findings and the judgment of conviction must be reversed. We disagree.

#### *Pretrial Proceedings*

As stated above, on September 6, 2019, over Watson's objection, defense declared a doubt as to Watson's competence and criminal proceedings were suspended. (§ 1368.) That same date, Drs. Dorian Hughes and Brandi Mathews were appointed, pursuant to sections 1367 and 1368, to examine Watson. They submitted conflicting reports regarding Watson's competency. On October 4, 2019, Watson was re-referred to Dr. Mathews for a supplemental report.

On November 8, 2019, the trial court granted a defense motion for a competency trial with the preliminary issue of Watson's competence to stand trial to be tried by a jury. Specifically, the issue was whether Watson could rationally assist his counsel in his defense.

A competency trial, with jury, was held January 2-3, 2020, finding Watson competent to stand trial.

#### *Testimony at the Competency Trial*

#### *1. Testimony of Doriann Hughes*

Dr. Hughes, a consultant psychologist for the Department of State Hospitals, testified that she was assigned to evaluate Watson and whether he could "understand the charges against [him], understand the proceedings against [him], and can work with [his] attorney in a rational capacity …." Dr. Hughes conducted the 90-minute long evaluation on Watson on September 20, 2019, at which point she determined he was incompetent to stand trial.

11.

Dr. Hughes testified that Watson's interview lasted a bit longer than normal because of the "difficulty in conducting the interview," stating it took a "really long time to get information from him and keep him focused on the questions." As part of the evaluation, Dr. Hughes conducted the "FIT-R" an instrument to evaluate competency to stand trial. The FIT-R looks at an individual's knowledge of the legal system, their understanding of consequences, and ability to communicate with counsel. Dr. Hughes opined that Watson's "most concerning area," was his ability to communicate with counsel, as he expressed "really irrational thinking."

Dr. Hughes also conducted a mental status examination and behavioral observation. Dr. Hughes testified that areas of concern were his ability to communicate, which jumped from topic to topic, and he was "quite expansive in his mood, so some mood instability." Dr. Hughes observed Watson to be "very animated and euphoric" throughout the interview, and she ascribed a diagnosis of bipolar disorder. Watson had reported a history of some mental health treatment, a history of depression, suicide, elation, and at one point had been reported having been diagnosed as bipolar.

Dr. Hughes did not conduct a malingering assessment of Watson because she did not think that was happening. Watson presented no indicators that lead her to believe that he was malingering.

Dr. Hughes testified that individuals with bipolar disorder benefit from medication, often within four to six weeks. Dr. Hughes did not find Watson competent to stand trial because, at the time she met with him, he was not taking medication, and was exhibiting symptoms that would impact his ability to work with his counsel in a coherent manner. Dr. Hughes recommended that Watson receive treatment competency training, which involved, in his case, primarily medication. Dr. Hughes again opined that Watson had difficulty communicating and also had a "significant distrust for his defense team."

On cross-examination, Dr. Hughes testified that Watson "did well" on the first prong of the FIT-R, as he understood the court process—what he was charged with, what

everyone's roll in the courtroom was, on the consequences he was facing. Watson discussed possible defenses to his case and offered different scenarios as to what he thought could have happened.

Dr. Hughes was concerned with Watson's distrust of and "irrational beliefs" about his attorney. Dr. Hughes acknowledged that someone could be diagnosed with bipolar disorder, depression, or be suicidal and still be competent to stand trial. She also acknowledged that Watson showed no signs of talking to someone who was not there or having hallucinations, and he was cognizant of his surroundings.

When asked if Watson had mentioned that he "tried to fire his attorney," Dr. Hughes testified that Watson had said he tried to fire him or wanted to fire him, but Dr. Hughes did not recall if Watson had actually gone through the process. Dr. Hughes knew such a procedure was known as a *Marsden* hearing. Following a sidebar, the People requested that the trial court take judicial notice and the court informed the jury of the fact that Watson had brought two *Marsden* hearings—one on September 6, 2019, and one on June 26, 2019—and both were denied. After the statement to the jury, Watson offered that there had been three *Marden* hearings, not two.

Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Watson had also told her he was upset at his attorney because the attorney had not checked into his alibi. Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said understood that it was important to discuss that with his attorney. He also understood that it was important for him to use proper decorum in the courtroom.

Dr. Hughes also could not rule out a diagnosis of a neurocognitive disorder based on a previous head trauma. Dr. Hughes acknowledged that Watson's methamphetamine use could affect his mental health issues.

## 2. *Testimony of Brandi Matthews*

Brandi Matthews, a licensed psychologist with the State of California as well as in private practice, was hired in her private capacity to evaluate Watson twice. Dr. Matthews's opinion after her second evaluation of Watson was that he was not able to assist counsel in a rational manner. According to Dr. Matthews, Watson appeared to understand her questions and provide relevant responses the first time she evaluated him. She described him as "goal directed," "calm and cooperative." The second time, when he began discussing various aspects of his case, he became very "loud," "very agitated," and exhibited "mood liability"—a rapid shift or change in mood. During the second interview, Dr. Matthews also noticed statements with underlying theme of paranoia related to the case, claiming a conspiracy against him and his family in Tulare County. Specifically, Watson thought the sheriff investigator on the case was leading a drug business at a hotel. And he believed there were pages missing in the police report that would be helpful to him.

Dr. Matthews stated that she did not administer any standardized evaluations of Watson during either interview. Dr. Matthews arrived at "diagnostic impressions," but not a "specific diagnosis." Dr. Matthews opined that Watson appeared to exhibit mood symptoms consistent with bipolar disorder, and had a "level of loss of touch with reality." He had difficulty remaining on topic during the 45-minute session.

Dr. Matthews acknowledged that Watson understood the charges against him and the consequences of being found guilty, he understood roles of courtroom personnel, and understood legal options. However, Dr. Matthews opined that Watson was not competent to stand trial because he was not able to assist counsel in a rational manner due to his psychiatric symptoms. Dr. Matthews cited Watson's belief that defense counsel was part of a conspiracy, and that he was innocent and did not think anyone was "working with him."

14.

Dr. Matthews testified that the primary treatment for bipolar disorder would be psychotropic medication. Dr. Matthews also discussed competency restoration programs, which could be administered in a state hospital or jail.

On cross-examination, Dr. Matthews was first asked about her first evaluation of Watson, which took place on September 13, 2019. At that point, Watson was "linear in thought." During that interview, Watson understood plea bargaining, the difference between a jury and court trial, and appropriate courtroom behavior. Dr. Matthews opined that, at that point, Watson was able to assist his attorney in conducting his defense. While she noted that Watson would continue to pose a challenge for his attorney, there was no evidence the difficulties were linked to psychotic symptoms.

After the first interview, Dr. Matthews received additional information about Watson from defense attorney and received multiple interviews with defense attorney's social worker. During the second interview on November 1, 2019, Watson spoke more about the facts of his case and the fact that he believed his attorney was not looking into possible defenses. Dr. Matthews did not see any signs of malingering on Watson's part.

In Dr. Matthew's second interview, Watson talked about the fact that he was being slandered on the sheriff's department Web site. Dr. Matthews acknowledged that it was not uncommon for a criminal defendant to fear or feel unnerved when in custody with the status of their case.

3. *Testimony of Joshua Nelson*

Joshua Nelson, a correctional deputy at the Bob Wiley Detention Facility, testified that he had weekly contact with Watson within the past year while he was an inmate there. Nelson never talked to Watson about his criminal case, nor had he heard Watson discuss it with other inmates. Nelson had not heard Watson scream or yell for no reason, and he had never been disrespectful towards Nelson.

*4. Testimony of Aaron Panttaja*

Aaron Panttaja, a correctional deputy at Bob Wiley Detention Facility, testified that he saw Watson on a daily basis for the past three months and had never seen him act out towards him or other staff or have outburst or yell. Panttaja observed Watson having what seemed like casual conversations with other inmates, and he had never heard him talk about his case to other inmates. Neither had he heard Watson talk about his attorney to any other inmate and he had received no complaints from other inmates about Watson's behavior.

*5. Testimony of Miguel Franco*

Miguel Franco, a detective with the Tulare County Sheriff's Office, testified that he had contact with Watson in March of 2019 and obtained a small bindle of methamphetamine from his person. Franco told Watson he was going to destroy it and he would not be charged with it. Franco testified that the sheriff's department put "vague information" on social media about Watson in an effort to get the public's assistance on further details of the crime.

### *Applicable Law and Standard of Review*

"As a matter of due process, '[a] defendant may not be put to trial unless he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' " ' (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354, quoting *Dusky v. United States* (1960) 362 U.S. 402) (*Dusky*).)." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 386 (*Buenrostro*).) "A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).)" (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*).)

16.

"The law presumes a person is competent to stand trial. ( … § 1369, subd. (f).) 'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' (*People v. Mendoza* (2016) 62 Cal.4th 856, 871 [(*Mendoza*)]; see … § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 446 ... [allocation of the burden of proof to a criminal defendant to prove incompetence does not violate procedural due process].)" (*Buenrostro, supra,* 6 Cal.5th at p. 387.)

Watson contends there is insufficient evidence to support the jury's verdict finding him competent to stand trial. Citing *People v. Samuel* (1981) 29 Cal.3d 489, Watson argues that a judgment of conviction must be reversed when there is "persuasive and virtually uncontradicted" evidence of a defendant's mental incompetence (*id.* at p. 506). We agree with that statement. He then asserts that the evidence in this case, which he contends was unanimous expert testimony contradicted only by lay testimony, is "persuasive and virtually uncontradicted" evidence of his mental incompetency. We disagree.

We apply "a deferential substantial evidence standard of review." (*Mendoza, supra,* 62 Cal.4th at p. 871.) When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial. (*Id.* at pp. 871-872, citing *People v. Marks* (2003) 31 Cal.4th 197, 219. fn. 3.) "In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence. [Citation.] Evidence is substantial if it is reasonable, credible, and of solid value." (*Marshall, supra,* 15 Cal.4th at p. 31.)

"Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We must

17.

presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio,* at p. 357.)

Here, substantial evidence supports the jury's verdict finding Watson competent to stand trial. The jury did not have to accept the opinion of experts. As our Supreme Court has observed: " 'Of course, the jury is not required to accept at face value a unanimity of expert opinion: "To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by jury...." ' " (*Marshall, supra,* 15 Cal.4th at p. 31.)

The value of an expert's opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the conclusion. (*Slaten v. State Bar* (1988) 46 Cal.3d 48, 55; *People v. Samuel, supra,* 29 Cal.3d at p. 498.) Here, both of Watson's expert witnesses, Dr. Hughes and Dr. Matthew, based their opinions regarding Watson's competence to stand trial primarily on their interviews with Watson. Dr. Matthews's opinion changed from finding Watson competent after the first interview to incompetent after the second interview, which took place after she had a conversation with defense attorney and she reviewed multiple interviews with Watson's attorney's social worker.

Both experts agreed that Watson was able to understand the nature of the proceedings against him—the charges he was faced with and the role of the attorneys, judge, witnesses, and jurors. The argument on appeal is that the jury received evidence from which it should have found Watson incompetent as he was unable to assist his counsel in the conduct of a defense in a rational manner. However, there was also evidence of Watson's ability to work with counsel at trial—if he wanted to—to support the jury's verdict of competency. While Watson expressed anger and frustration with his attorney for not doing what he wanted him to do, he did not exhibit irrational thinking or

inability to assist in his defense. Watson had, by his own calculations, attempted three times to dismiss his attorney.

The two deputy correctional officers at the detention facility where Watson was housed testified to no abnormal behavior on Watson's part in that setting. Both had continued contact with Watson.

In *People v. Samuel, supra,* 29 Cal.3d 489, our Supreme Court reversed for insufficiency of evidence a jury's verdict finding the defendant in that case competent to stand trial. But *Samuel* is factually distinguishable from this case. In *Samuel,* five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified that the defendant was incompetent to stand trial. This testimony was supported by four psychiatric reports, and the prosecution's witnesses did not contradict any of the defense testimony. (*Id.* at pp. 497–498.)

Here, in contrast, only two defense experts testified regarding Watson's incompetence to stand trial. As set forth above, their opinions were somewhat tenuous. Both experts opined that Watson was not able to adequately communicate with his defense counsel and therefore unable to assist counsel in his defense. Watson had complained to both experts that counsel was not listening to him and did not follow through on his suggestions for his defense. Dr. Hughes testified that Watson told her he was upset at his attorney because the attorney had not checked into his alibi. However, Dr. Hughes also acknowledged that, when she asked Watson how he would react if he did not like what someone was saying on the witness stand, he said he understood that it was important to discuss that with his attorney. He also understood that it was important for him to use proper decorum in the courtroom. Dr. Hughes acknowledged that, at one point, Watson made a statement to her that, if he committed the crime as alleged, he would say he was crazy because he could get less time. Dr. Hughes agreed that it was "difficult" at times how to distinguish between someone who is choosing not to work

with their attorney and someone who has a mental disorder affecting their inability to do so.

In support of her opinion that Watson could not assist in his defense, Dr. Matthews cited the fact that Watson believed defense counsel was part of a conspiracy, as was the sheriff's department, and that Watson believed he was innocent and did not think anyone was "working with him."

Watson's dispute with his attorney over how to handle his case does not invalidate his competency to stand trial. In *People v. Hightower* (1996) 41 Cal.App.4th 1108, the court rejected a defendant's contention that "his disruptive behavior in the courtroom and disputes with defense counsel prove that he was not competent to stand trial." (*Id.* at p. 1112.) The court in *Hightower* reasoned, "His conduct demonstrates an unwillingness to cooperate with defense counsel but does not constitute proof of mental incompetence. '[T]he test, in a section 1368 proceeding, *is competency to cooperate, not cooperation.*' " (*Hightower*, at p. 1112, italics added; accord, *People v. Clark* (2011) 52 Cal.4th 856, 893.)

We conclude the evidence presented to the jury was sufficient to support the jury's verdict that Watson was competent to stand trial.

II. DID THE TRIAL COURT ERR WHEN IT REFUSED A MODIFYING INSTRUCTIONS ON THE MEANING OF TO "RATIONALLY ASSIST" COUNSEL DURING THE COMPETENCY PROCEEDINGS?

Watson next contends that the trial court erred in denying his request for a pinpoint instruction during the competency proceedings to clarify that "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. We find no error.

*Background*

The trial court instructed with CALCRIM No. 3451, which, as relevant here, instructed the jury that,

> "[Watson] is mentally competent to stand trial if he can do all of the following: Number one, understand the nature and purpose of the criminal proceeding against him; number two, assist, in a rational manner, his attorney in presenting his defense, and; number three, understand his own status and condition in the criminal proceedings. [¶] The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is … now mentally incompetent because of a mental disorder."

During the competency proceedings, Watson requested the instruction be modified to define the term "rationally assist" as follows:

> "Assist his attorney in presenting his defense means that the defendant has the ability to do the following: [¶] 1. Decide whether to remain silent or whether to testify about issues relevant to the charges. [¶] 2. Decide whether to put on a defense. [¶] 3. Decide whether to raise one or more affirmative defenses. [¶] 4. Help his attorney to identify possible witnesses. [¶] 5. Help his attorney to question the government witnesses about issues relevant to the charges. [¶] 6. Decide on overall trial strategy. [¶] If the defendant cannot assist his attorney in a rational manner because of a mental disorder, then you must find him to be incompetent."

The People objected to the proposed instruction as unnecessary. The trial court rejected the proposed instruction "with respect to what it means to assist counsel in presenting a defense" because there "hasn't really been any testimony with respect to the details of what that means, and there wouldn't be any facts to back up any of this—any of the specific areas based upon what the defense has presented at this point." However, the trial court clarified that is would not preclude counsel from arguing "what those various things may be," and would revisit the issue if the jury questioned the phrase. The jury did not submit any questions.

21.

*Applicable Law and Analysis*

As noted above, "The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent." (*Buenrostro, supra,* 6 Cal.5th at p. 385.) The United States Supreme Court established the test for competence to stand trial in *Dusky, supra,* 362 U.S. 402: "it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " In California, a defendant is mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

CALCRIM No. 3451 is consistent with section 1367, and the California Supreme Court has held that even though section 1367 does not match the test articulated in *Dusky* word for word, " ' "[t]o anyone but a hairsplitting semanticist, the two tests are identical." ' " (*People v. Dunkle* (2005) 36 Cal.4th 861, 893 (*Dunkle*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *Buenrostro, supra,* 6 Cal.5th at p. 386.)

Watson argues that the trial court should have included an instruction to clarify that the "ability to rationally assist counsel" includes the ability to understand the facts of the case and one's basic constitutional rights. The California Supreme Court rejected the contention that CALJIC No. 4.10, which mirrors CALCRIM No. 3451, is deficient because it omits the requirements of " 'a rational as well as factual' " understanding of the proceedings, as set forth in *Dusky*. (*Buenrostro, supra,* 6 Cal.5th at p. 390.) Like CALCRIM No. 3451, CALJIC No. 4.10 informed the jury that its task was to " 'decide whether the defendant is mentally competent to be tried for a criminal offense' " and

22.

explained that " 'a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against [him or her] if, one, [he or she] is capable of understanding the nature and purpose of the proceedings against [him or her]; two, [he or she] comprehends [his or her] own status and condition in reference to such proceedings; and, three, [he or she] is able to assist [his or her] attorney in conducting [his or her] defense in a rational manner.' " (*Buenrostro, supra,* at p. 385.)  The Supreme Court held that the CALJIC No. 4.10 instruction was not infirm merely because it did not focus specifically on the defendant's " 'rational and factual' " understanding of the proceedings.  (*Buenrostro,* at p. 390.)  It concluded that " 'one's ability to grasp the nature of the proceedings necessarily encompasses one's capacity to have a rational and factual understanding of the proceedings.' " (*Ibid.*)

The Supreme Court also rejected a challenge to the CALJIC No. 4.10 instruction on grounds that it did not explain the various constitutional rights implicated in a criminal trial and failed to tell the jury how much and what kind of assistance a defendant must be able to provide counsel.  (*Dunkle, supra,* 36 Cal.4th at p. 894.)  In particular, the California Supreme Court held that the words "assist" and "rational manner" as used in the CALJIC No. 4.10 instruction were not technical terms that required instruction by the trial court.  (*Dunkle,* at pp. 894–896.)

We conclude, consistent with *Buenrostro* and *Dunkle*, that the CALCRIM No. 3451 instruction given here adequately informed the jury of the required findings under section 1367.  The requisite findings of Watson's ability to "understand the nature and purpose of the criminal proceedings against him," "assist, in a rational manner, his attorney in presenting his defense" and "understand his own status and condition in the criminal proceedings" described in CALCRIM No. 3451 encompassed Watson's ability to understand the facts of the case against him and his basic constitutional rights.  The trial court did not err in refusing the requested pinpoint instruction.

III. DID THE TRIAL COURT ERR IN INSTRUCTING ON "MUTUAL COMBAT" AND "PRETEXTUAL" SELF-DEFENSE WHEN THERE WAS NO SUBSTANTIAL EVIDENCE TO JUSTIFY THE INSTRUCTION?

Watson next argues the trial court erred and violated his constitutional rights during the guilt phase of his trial by instructing the jury with CALCRIM Nos. 3471 and 3472. Watson contends the instructions were not supported by the evidence and that giving the instructions impermissibly deprived him of the ability to rely on self-defense or imperfect self-defense, violating his Sixth and Fourteenth Amendment rights to due process and to present a defense.

Respondent argues Watson forfeited the claim by failing to object. If not forfeited, respondent contends there was no error, or that any error was harmless. Exercising our discretion to reach the merits, we find no reversible error.

*Procedural background*

During a discussion of proposed jury instructions, defense counsel requested instructions on self-defense (CALCRIM No. 505) and voluntary manslaughter/imperfect self-defense (CALCRIM No. 571). The trial court later inquired, "The self-defense, any questions to that one?" Defense counsel questioned if the trial court was "looking at 3471." The trial court replied, "Yes. 3471," and defense counsel stated, "No objection." The trial court then asked, "Same thing with 3472." And again, defense counsel stated, "No objection."

CALCRIM No. 3471, as given, provided:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; and

"3. He gave his opponent a chance to stop fighting.

24.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

CALCRIM No. 3472 as given, instructs that "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

### *Standard of Review*

A trial court must give a requested instruction only if there is substantial evidence to support it, that is, evidence sufficient to deserve jury consideration. (*Marshall, supra,* 15 Cal.4th at p. 39.) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050.) We review the propriety of a trial court's instructions de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) A challenged instruction may not be judged in isolation but must be considered in the context of the instructions as a whole. (*Ibid.*) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Ibid.*)

### *Applicable Law and Analysis*

As a threshold matter, we address respondent's argument that Watson forfeited his contention by failing to object to the instructions below. We conclude that, while Watson did forfeit his claims by failing to object, it is within our discretion to address his claim on the merits to determine whether there was an impairment of his substantial rights.

25.

(*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 916; *People v. Felix* (2008) 160 Cal.App.4th 849, 858.)  We do so here.

Turning to the merits, we reject Watson's claim that the trial court erred by instructing the jury with CALCRIM Nos. 3471 and 3472.  Watson's argument that the instructions were not supported by substantial evidence relies almost exclusively on his own theory of the case while essentially ignoring the reasonable inferences that can be drawn in support of the judgment. When all the evidence is considered, and viewed in the light most favorable to the judgment, we conclude there was substantial evidence to support the challenged instructions.

In particular, the evidence shows that Watson and D.A. were involved in an altercation—with D.A. wanting Watson to drive and Watson wanting her out of his vehicle, or even that Watson was the initial aggressor.  Watson told police that, at Hales Cottage, D.A. came up to his truck and demanded a ride.  When he refused, D.A. began kicking his truck and throwing rocks at it.  Watson ended up letting her into the truck, but said she was an "evil bitch," and, had she been bigger, he would have punched her. Watson acknowledged that, from the beginning of their encounter, he was going to use "brute force" if he had to.

When D.A. pulled out a razor blade while in the vehicle, Watson became furious that D.A. was damaging his truck.  He said his plan was to grab her hand, "jerk her dumb ass out of my truck" and punch her in the mouth before driving away.  According to Watson, the two wrestled and Watson was "pushing her harder" and the gun went off. While Watson claimed he did not intend to shoot her, he did say he wanted to punch her in the mouth because she cut his seat belt.  During Watson's statements to law enforcement after the incident, he repeatedly voiced his disdain for D.A., at one point stating "that girl was evil.  There was lot of people probably wanted to kill that bitch."

On this record, there was substantial evidence that Watson was the initial aggressor and/or that he provoked the confrontation with the intent to create an excuse to

use deadly force. (See, e.g., *People v. Salazar* (2016) 63 Cal.4th 214, 222, 249–250; *People v. Enraca* (2012) 53 Cal.4th 735, 761–762; *People v. Bolton* (1979) 23 Cal.3d 208, 215; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334.)  Thus, it was not error to instruct the jury with CALCRIM Nos. 3471 and 3472.

IV.   IS REMAND NECESSARY BECAUSE THE TRIAL COURT DID NOT CONSIDER WHETHER TO STRIKE OR MODIFY WATSON'S GUN ALLEGATION?

Watson next contends that the trial court did not consider whether to strike or modify the firearm enhancement (§ 12022.53, subd. (d).)  We disagree.

*Background*

At sentencing, the trial court sentenced Watson, in part, on count 1 to 15 years to life, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) gun allegation.  Defense counsel had argued that the imposition of a 25-year-to-life sentence was tantamount to a life without parole due to Watson's age, which was 55 years.  Counsel argued, "If the Court were to stay the 25-to-life special …. The Court has discretion to do that or not."  The trial court responded, stating, "Okay. Alright.  Based on what I heard at the trial and Mr. Watson's extensive record, I don't see a justification for the dismissal of that particular charge."

*Applicable Law and Analysis*

Watson claims that, at the time he was sentenced in August of 2021, the trial court believed it had discretion only to strike or dismiss that gun enhancement, and was unaware of its discretion to impose a lesser gun enhancement under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), which was decided after Watson's sentencing.  The California Supreme Court issued its opinion in *Tirado,* resolving a split of authority among the Courts of Appeal on the question of whether a trial court may strike a section 12022.53, subdivision (d) enhancement and impose a lesser, uncharged section 12022.53 enhancement; *Tirado* applies to all nonfinal judgments.

"Section 12022.53 sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies ... : a 10-year prison term for personal use of a firearm, even if the weapon is not operable or loaded (*id.,* subd. (b)); a 20-year term if the defendant 'personally and intentionally discharges a firearm' (*id.,* subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes 'great bodily injury' or 'death, to any person other than an accomplice' (*id.,* subd. (d))." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124.) "For these enhancements to apply, the requisite facts must be alleged in the information or indictment, and [the] defendant must admit those facts or the trier of fact must find them to be true." (*Id.* at pp. 1124–1125.)

Section 12022.53, subdivision (h), as amended effective January 1, 2018, provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 2.) Section 1385 provides: "[A] judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action be dismissed." (§ 1385, subd. (a).) Section 1385 further provides that where "the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice." (§ 1385, subd. (b)(1).)

In *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), the court concluded that under then newly amended section 12022.53, subdivision (h), trial courts had the discretion to strike a section 12022.53 enhancement and impose a lesser included, *uncharged* section 12022.53 enhancement. (*Morrison*, at pp. 222–223.) *Morrison* explained that case law generally supports the imposition by a trial court of a lesser enhancement that was not charged in the information when the greater, charged

enhancement was found true by the trier of fact, but the trial court thereafter found that greater enhancement to be either legally inapplicable or unsupported by sufficient evidence. (*Id.* at p. 222.) Based on that general discretion, *Morrison* extended the scope of a trial court's discretion by concluding that a trial court could also impose a lesser section 12022.53 enhancement after striking a section 12022.53, subdivision (d) enhancement under section 1385, *even if* that lesser enhancement had not been charged in the information and not been found true by a trier of fact. (*Morrison*, at pp. 222–223.)

In this court's opinion in *People v. Tirado* (2019) 38 Cal.App.5th 637 (review granted Nov. 13, 2019, S257658 and reversed and remanded by *Tirado, supra,* 12 Cal.5th 688), this court concluded that the plain language of section 1385 and 12022.53, subdivision (h), did not authorize a trial court to substitute one enhancement for another. (*People v. Tirado*, *supra,* 38 Cal.App.5th at p. 643.) Accordingly, this court concluded that trial courts do not have the authority to impose lesser, uncharged section 12022.53 enhancements, but rather, have only the binary choice of imposing a section 12022.53, subdivision (d) enhancement or striking or dismissing it. (*People v. Tirado, supra,* 38 Cal.App.5th at pp. 640, 643–644.) In so holding, the court expressed disagreement with the reasoning and holding in *Morrison, supra,* 34 Cal.App.5th 217. (*People v. Tirado*, *supra,* 38 Cal.App.5th at p. 644.)

In *Tirado, supra,* 12 Cal.5th 688, the California Supreme Court noted the Courts of Appeal split on the question of whether a trial court has the authority to strike a greater section 12022.53, subdivision (d) enhancement and impose a lesser, uncharged section 12022.53 enhancement instead, and agreed with *Morrison's* holding that trial courts do have such discretion. (*Tirado*, at pp. 696, 701.) In explaining its holding, *Tirado* applied reasoning somewhat different from that applied in *Morrison*, concluding: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[,subdivision] (d) enhancement, and the court determines that the section

12022.53[, subdivision] (d) enhancement should be struck or dismissed under section 12022.53[, subdivision] (h), the court may, under section 12022.5 [, subdivision] (j), impose an enhancement under section 12022.53[, subdivision] (b) or (c)." (*Tirado*, at p. 700.) The court reasoned that section 12022.53, subdivision (h) gives trial courts the discretion to strike or dismiss a greater, charged section 12022.53 enhancement and that section 12022.53, subdivision (j) gives them the discretion to impose a lesser, uncharged section 12022.53 enhancement where the accusatory pleading alleged, and the jury found true, the facts supporting such a lesser, uncharged section 12022.53 enhancement. (*Tirado*, at pp. 694, 697.)

In particular, the court stated: "Section 12022.53[, subdivision] (j) is the subdivision that authorizes the imposition of enhancements under section 12022.53. It provides that for the penalties in section 12022.53 to apply, the existence of any fact required by section 12022.53[, subdivision] (b), (c), or (d) must be alleged in the accusatory pleading and admitted or found true." (*Tirado*, 12 Cal.5th at p. 700.) Accordingly, *Tirado* held that a trial court has the discretion to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged section 12022.53 enhancement where the facts supporting that lesser enhancement were alleged in the information and found true by the jury.

Watson asserts that because the record shows that the trial court was unaware of its discretion to strike the section 12022.53, subdivision (d) enhancement and instead impose lesser, uncharged section 12022.53 enhancements, we must remand the matter to permit the court to decide whether to exercise that discretion.

Respondent argues that, unlike in *Tirado* and *Morrison*, Watson was actually charged with the lesser-included firearm enhancement (§ 12022.53, subds. (b), (c)), along with the more severe enhancement (§ 12022.53, subd. (d)). Respondent argues that the issue in *Tirado* and *Morrison* was whether a court may strike a firearm enhancement and instead impose a lesser uncharged firearm enhancement. (See *Tirado, supra,* 12 Cal.5th

at p. 696 ["The question is whether the court can strike the section 12022.53[, subdivision ](d) enhancement and, in its place, impose a lesser enhancement … even if the lesser enhancements were not specifically charged in the information or found true by the jury."]; *Morrison, supra,* 34 Cal.App.5th at pp. 224–225 [whether the court has discretion to impose uncharged lesser firearm enhancements "only arises in cases where those enhancements have not been charged in the alternative and found true"].

Here, the verdict forms reflect that the jury found firearm enhancements pursuant to section 12022.53, subdivisions (c) and (d) to be true,[3] and the trial court expressly stayed the lesser enhancement in favor of imposing the greatest enhancement, after explaining its reasoning for doing so.  We therefore reject Watson's request for remand on this issue.

Because we have addressed this issue on the merits, we need not address Watson's alternate claim that counsel was ineffective for failing to alert the trial court to the "*Tirado/Morrison* issue."

V.      IS WATSON ENTITLED TO THE BENEFIT OF SENATE BILL NO. 567 AND ASSEMBLY BILL NO. 124?

Watson argues his case must be remanded for resentencing because of recent amendments to section 1170, as amended by Senate Bill No. 567 and Assembly Bill No. 124.  He contends that because his case is not yet final on appeal, he is entitled to the benefits of section 1170, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada* (1965) 63 Cal.2d 740.  Respondent agrees that we should remand the matter for resentencing and permit the trial court to reconsider its sentencing choices under the recent amendments. We accept respondent's concession.

---

[3]      Although section 12022.53, subdivision (b) was also alleged in the information, it was not included in the verdict forms.

31.

*Background*

At Watson's sentencing August 31, 2021, as relevant here, the trial court imposed an upper term of three years on count 2, consecutive to count 1, and an upper, concurrent term of three years for count 3. The trial court did not make any specific findings on the record, but stated: "I think based on everything that the Court knows about this case and Mr. Watson's prior record, the recommendation from Probation is the appropriate sentence."

*Senate Bill No. 567 and Assembly Bill No. 124*

Senate Bill No. 567 amended section 1170, subdivision (b) by restricting a trial court's discretion to impose an upper-term sentence. (Stats. 2021, ch. 731, § 1.3.) As relevant here, effective January 1, 2022, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*).)

Also effective January 1, 2022, Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), amended section 1170 by adding paragraph (6) to subdivision (b), as follows: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the

32.

time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6).)

The parties agree, as do we, that Senate Bill No. 567 and Assembly Bill No. 124 both apply retroactively to Watson. (*Flores, supra,* 73 Cal.App.5th at p. 1039; *In re Estrada, supra,* 63 Cal.2d 740.)

Respondent concedes that the upper-term sentence was not consistent with Senate Bill No. 567, as the record does not reflect that any aggravating circumstances were proven by a jury beyond a reasonable doubt, admitted by Watson, or related to his prior convictions based on certified records of conviction. (§ 1170, subds. (b)(1)-(3).) We accept this concession. We also agree with respondent that because Watson is entitled to a full resentencing on remand (*People v. Buycks* (2018) 5 Cal.5th 857, 893–894), he may present to the trial court any evidence relating to whether he should receive a low-term sentence under Assembly Bill No. 124 and section 1170, subdivision (b)(6).

VI.   IS REMAND NECESSARY BECAUSE THE TRIAL COURT DID NOT CONDUCT AN ABILITY TO PAY HEARING PRIOR TO IMPOSING THE RESTITUTION FINE AND FEES?

At sentencing, Watson was ordered to pay a restitution fine of $10,000 (§ 1202.4, subd. (b)), a court operations assessment of $120 (§ 1465.8), and a court facilities assessment of $90 (Gov. Code, § 70373). Although he did not object below, he contends the trial court violated his state and federal due process rights by imposing the fine and assessments without first determining his ability to pay them. He requests that we remand for the trial court to determine his ability to pay.

*Applicable Law and Analysis*

Watson relies on *People v. Duenas* (2019) 30 Cal.App.5th 1157 (*Duenas*) in support, which held that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes any fines

33.

or fees.[4]  (*Id.* at pp. 1164, 1167.)  *Duenas* was decided on January 8, 2019, over a year and a half before Watson was sentenced in August 2021.  To the extent his argument is forfeited, Watson alleges ineffective assistance of counsel.

Because we are remanding for resentencing, see part V. of Discussion, above, Watson may raise his ability to pay claim at that time, and we need not discuss it further.

VII.    MUST THE ABSTRACT OF JUDGMENT BE CORRECTED?

As relevant here, during sentencing, the trial court ordered Watson to serve a 40-year-to-life sentence for count 1, with three-year upper terms for counts 2 and 3 to run concurrent.  However, on the abstract of judgment, the clerk failed to check off "concurrent" but instead placed the term in parenthesis regarding count 3.  Thus, while the reporter's transcript and the minute order reflect that the three-year term on count 3 was ordered to run concurrent to count 2, the abstract of judgment fails to reflect this.

Both parties agree, as do we, that this error must be corrected.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The sentence is vacated, and the case is remanded for resentencing under section 1170, subdivision (b), as amended by Senate Bill No. 567 and Assembly Bill No. 124. Following resentencing, the superior court clerk is directed to prepare a corrected and

---

[4]    The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and, if so, which party bears the applicable burden of proof.  (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

A panel of this court in *People v. Aviles* (2019) 39 Cal.App.5th 1055 held that *Duenas* was wrongly decided.  The *Aviles* Court concluded that an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are disproportionate and thus excessive.  (*Id.* at pp. 1068–1072.)

34.

amended abstract of judgment, and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                         FRANSON, J.

WE CONCUR:


HILL, P. J.


LEVY, J.